FLOREA & CO., INC. *v.* UNITED STATES

**No. 7155.**—Invoice dated Yokohama, Japan, May 2, 1936.
Certified May 2, 1936.
Entered at New York, N. Y., May 26, 1936.
Entry No. 845859.

Second Division, Appellate Term

(Decided April 8, 1947)

*William Whynman* for the appellant.

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster*, special attorney), for the appellee.

Before TILSON, KINCHELOE, and LAWRENCE, Judges; TILSON, J., dissenting

LAWRENCE, Judge: The judicial history of this case is as follows:

1. Importer's appeal for reappraisement was originally decided by the trial court in *Florea & Co., Inc. v. United States*, 11 Cust. Ct. 384,

Reap. Dec. 5908, the appeal being dismissed pursuant to the provision in section 501 of the Tariff Act of 1930 which provides that:

\* \* \* No such appeal filed by the consignee or his agent shall be deemed valid, unless he has complied with all the provisions of this Act relating to the entry and appraisement of such merchandise. \* \* \*

The Government contended that the importer had failed to comply with the numerous provisions of sections 481, 482, 484, and 485 of said act, which, it was alleged, must be complied with by the importer in order that its appeal may be deemed valid.

2. Upon application for review of said decision, this division was *unanimous* in holding the appeal to be valid. Moreover, a *majority* of the court was of the opinion that the importer had failed to make a *prima facie* case on the merits and on that ground affirmed the judgment of the trial court in dismissing the appeal. *Florea & Co., Inc.* v. *United States*, 15 Cust. Ct. 376, Reap. Dec. 6190.

3. On appeal by the importer to the United States Court of Customs and Patent Appeals, it was held that—

\* \* \* Since no value was found by the trial court the clear duty of the division, when it held that it was error to dismiss the appeal for the reasons assigned by the trial court, was to reverse that judgment and remand the case to the trial court for proceedings in accordance with law.

*Florea & Co., Inc.* v. *United States*, 34 C. C. P. A. (Customs) 26, C. A. D. 339.

Parenthetically, it may be noted that inasmuch as the original appraisement was made prior to the enactment of the Customs Administrative Act of 1938, this case is governed by the provisions of the Tariff Act of June 17, 1930.

4. Upon remand, the case was again decided by the trial court, and as the only question then before it was whether the importer had established a statutory value for the merchandise different from that found by the appraiser, the court found, after examining the evidence, that the "record herein fails to establish any value for the instant merchandise different from that found by the appraiser, which I hold to be the proper dutiable value," and judgment was entered accordingly. *Florea & Co., Inc.* v. *United States*, 17 Cust. Ct. 447, Reap. Dec. 6561.

5. The case is again before us upon application for review of the decision of the trial court on remand.

Briefly stated, the basic facts are that appellant imported from Japan certain wool knit gloves and entered them at the invoice price of 6.10 yen per dozen ($1.76 U. S. currency) which it claimed to be the dutiable export value as defined in section 402 (d) of the Tariff Act of 1930. The appraiser found an export value of 5.90 yen per dozen ($1.70 U. S. currency). By virtue of a Presidential proclamation

(69 Treas. Dec. 393, T. D. 48183) which declared that duty on wool knit gloves from Japan, valued at not more than $1.75 per dozen, shall be based upon the American selling price as defined in section 402 (g) of said act, the merchandise was appraised on that basis at $5.50 per dozen.

The contentions of the parties have been exhaustively reviewed upon oral argument and in briefs, and we have painstakingly examined the entire record. Upon the evidence before us we are of the opinion that appellant failed to make a *prima facie* case and hence we see no reason for disturbing the finding of the trial court that the—

* * * record herein fails to establish any value for the instant merchandise different from that found by the appraiser, which I hold to be the proper dutiable value. * * *

which finding and holding we adopt as our own. In view of this conclusion, we deem it unnecessary to discuss other contentions presented by appellant.

The judgment appealed from is therefore affirmed and judgment will be entered accordingly.

### DISSENTING OPINION

TILSON, Judge: I again find myself in disagreement with the conclusions reached by my associates in this case. The history of this case has been sufficiently detailed by my associates and it is therefore unnecessary for me to repeat the same here.

The trial court states, referring to the previous decision of this division in this case, Reap. Dec. 5908, that:

In reviewing my decision * * * a majority of the Second Division held * * * that "there was substantial compliance by the consignee or his agent, with the provisions of the act of 1930," * * *

In order that there may be no misunderstanding as to my views regarding the validity of the appeal when this application for review was before us previously, I quote the following from my dissenting opinion therein:

Therefore, after having carefully considered all of the evidence in this case, I find that the weight of such evidence shows that the appellant complied with all the provisions of this act relating to the entry and appraisement of the merchandise in this case. I, therefore, hold the appeal to be valid.

In its decision now on review, the trial court stated:

Plaintiff's proof, attempting to support its entered value, is wholly inadequate under the requirements of the statute, said section 402 (d), defining export value. The treasurer of the plaintiff corporation merely testified that in arranging for the purchase of the gloves in question, he investigated the foreign market by visiting "exporters," whom he referred to as people in Japan "who purchased merchandise for clients who came from abroad, and sold it to them at what they considered the best possible price." He consulted these so-called exporters, "showing them the sample and getting quotations as to what they *could* manu-

facture the same glove for." [Italics added.] Whether the "exporters" actually manufactured and sold, or offered for sale, gloves, like or similar to those in question, is not disclosed by the record. The witness' only statement, concerning a price, is that he "found out it was anywhere from 6.40 to 7 yen." Certainly such an indefinite quotation, as to what the gloves in question *could* be manufactured for, is not a compliance with the statutory requirement of showing the "market value or price" at which such or similar merchandise was freely offered for sale to all purchasers.

Section 501 of the Tariff Act of 1930 provides, in part:

* * * The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

The records of this court are replete with decisions where the importer of merchandise has failed to prove that the appraised value was wrong and that the value he was contending for was correct because the witness by whose testimony these facts were sought to be established had *not* "investigated the foreign market by visiting exporters * * * who purchased merchandise for clients who came from abroad, and sold it to them at what they considered the best possible price." If the decision of the majority should be affirmed, this will perhaps be the first case which has been decided adversely to the importer's contention because his witness had "investigated the foreign market by visiting 'exporters,' * * * who purchased merchandise for clients who came from abroad, and sold it to them at what they considered the best possible price." If the testimony of a witness who has investigated the foreign market by visiting exporters is to be discarded as worthless, then what qualifications, may we ask, must a witness possess before his testimony is to be given consideration and weighed in the decision of an issue?

It is believed to be a matter of common knowledge that the majority, if not all, importers, either personally or through an agent, investigate the foreign market by visiting the exporter prior to making purchases in such foreign market. Few business people are prone to buy a "pig in a poke," and if they should, their testimony would be of little, if any, value in establishing a value for the merchandise thus purchased.

According to the decision of the trial court, the witness consulted these exporters, "showing them the sample and getting quotations as to what they *could* manufacture the same glove for." How else would a prudent businessman obtain any price for an article he desired to purchase? It should be remembered, of course, that only a sample of the glove the importer desired was in existence and that he was endeavoring to obtain a price from these exporters at which he could purchase large quantities of gloves made according to the sample he was submitting to them.

This brings us to the next statement by the trial court that: "Whether the 'exporters' actually manufactured and sold, or offered for sale, gloves, like or similar to those in question, is not disclosed by the record." The best refutation of this statement is the fact that we have right before us in this case 85 dozen gloves, not like or similar, but the actual gloves in question. They were sold to the importer by one of the exporters who had been visited and investigated by one of the witnesses testifying in this case. I am unable to see anything unusual about an importer visiting four or more exporters or manufacturers from whom he solicited prices at which they would undertake to manufacture gloves like the sample he submitted to them, and receiving from the four or more exporters or manufacturers prices or quotations ranging from 6.40 to 7 yen per pair. It would have been much more unusual had he received the identical price from each one he visited.

Based upon the facts in this case, and following the principle announced in the case of *United States* v. *Mexican Products Co.*, 28 C. C. P. A. 80, the court might well have held the value of the gloves in question to be 7 yen, this being the price at which all purchasers could buy.

In an effort to establish that the entered and invoiced values of these gloves were the proper dutiable values, counsel for the appellant offered the testimony of William J. Pickett and Melvin Adler. Witness Pickett testified in effect that in making his appraisement he found that the purchase of these gloves was made in the ordinary course of trade, without any restrictions, and that the price did not vary according to the quantity purchased; that the merchandise was entered at ¥6.10 per dozen, and that he found a value of ¥5.90 per dozen.

Q. Now what differences arose or what questions were in dispute between you and the importer, as far as this entry is concerned, and your finding?

\* \* \* \* \* \* \*

The WITNESS. There was a dispute in this respect, I found out that the export value was 5.90, against the invoice value of 6.10.

By Mr. WHYNMAN:

Q. Was there any other element or question involved than 5.90, as against 6.10 per dozen, unit?—A. If I understand your question right, no.

\* \* \* \* \* \* \*

X Q. And your appraisement was on the basis of export value, is that right?—A. American selling price.

X Q. Based upon what?—A. Finding an export value of 5 yen 90 per dozen, net, packed.

X Q. In finding that value of 5.90 yen per dozen packed, did you take into consideration all the statutory elements of export value?—A. Yes.

Witness Adler who had investigated the foreign market by visiting exporters, showing them a sample and getting quotations from these exporters or manufacturers as to what they could manufacture the

same glove for, testified regarding the market value of these gloves, as follows:

Q. In arranging the purchase, did you determine or do anything or investigate the market of that glove?—A. I did.

Q. Tell us what you did.—A. Well I investigated the market by consulting with other exporters.

Q. Go ahead.—A. Showing them the sample and getting quotations as to what they could manufacture the same glove for.

Q. And you found out?—A. Found out it was anywhere from 6.40 to 7 yen.

Q. And eventually arranged the sale with?—A. The Merchandise Trading Co.

\*       \*       \*       \*       \*       \*       \*

Q. At what price?—A. 6 yen, 10.

Q. And did you buy it in the ordinary course of trade?—A. I did.

Q. Was there any restrictions on it?—A. None.

\*       \*       \*       \*       \*       \*       \*

Q. There were no restrictions placed on you, were there?—A. So far as what?

Q. As far as you could sell, you could do as you liked?— A. That is right.

Q. Did you know if anybody else could buy at the same price the same glove?—A. Everybody would be able to buy the same glove if they could pay for it.

Q. It was just an ordinary every day transaction, anybody could buy at all?—A. That is correct.

Q. And that was in the usual wholesale quantities?—A. That is correct.

\*       \*       \*       \*       \*       \*       \*

X Q. Now you stated you had quotations, some quotations from other exporters. What other exporters, did you obtain quotations from?—A. One in particular, was the Oriental Purchasing Co., in Yokohama.

X Q. In Yokohama, and who else?—A. Nomura & Co.

\*       \*       \*       \*       \*       \*       \*

X Q. Who else?—A. There may have been one or two other Japanese concerns, the names of whom I cannot remember.

\*       \*       \*       \*       \*       \*       \*

X Q. Now when did you get these quotations from those two exporters that you remember?—A. At the same time, during this transaction.

\*       \*       \*       \*       \*       \*       \*

X Q. Which one quoted you? What price did you say they quoted you?—A. Anywhere from 6.40 to 7 yen.

X Q. Per dozen?—A. Correct.

\*       \*       \*       \*       \*       \*       \*

R Q. Why did you go to visit these other places?—A. Well being a buyer, and rather conservative, naturally where I wanted to be certain, I wanted to——

R. Q. So you were checking on their contract, and checking the market too—? A. That is right, which is a customary thing for a buyer to do.

In view of the concession of counsel for appellee that "No questions relating to foreign value are involved" in this case, it is my considered opinion that the above testimony establishes a *prima facie* case for the plaintiff. There being no evidence on the part of the Government to overcome this *prima facie* case, judgment should be rendered holding the proper dutiable export value of the gloves in question to be the invoiced and entered value thereof.